# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

Case No.: _____

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, INC.; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; ASIAN REAL ESTATE ASSOCIATION OF AMERICA, and KING REALTY ADVISORS, INC. | **COMPLAINT** |

Plaintiffs,

v.

J. ALEX KELLY, in his official capacity as Secretary of Commerce; PATRICIA FITZGERALD, in her official capacity as Chair of the Florida Real Estate Commission; GINGER BOWDEN MADDEN, in her official capacity as State Attorney for Florida's First Judicial Circuit; JACK CAMPBELL, in his official capacity as State Attorney for Florida's Second Judicial Circuit; JOHN DURRETT, in his official capacity as State Attorney for Florida's Third Judicial Circuit; MELISSA NELSON, in her official capacity as State Attorney for Florida's Fourth Judicial Circuit; BILL GLADSON, in his official capacity as State Attorney for Florida's Fifth Judicial Circuit; BRUCE L. BARTLETT, in his official capacity as State Attorney for Florida's Sixth Judicial Circuit; R.J. LARIZZA, in his official capacity as State Attorney for Florida's Seventh Judicial Circuit; BRIAN S. KRAMER, in his official capacity as State Attorney for Florida's Eighth Judicial Circuit; ANDREW A. BAIN, in his official capacity as State Attorney for Florida's Ninth Judicial Circuit; BRIAN HAAS, in his official capacity as State Attorney for Florida's Tenth Judicial Circuit;

KATHERINE FERNANDEZ-RUNDLE, in her official capacity as State Attorney for Florida's Eleventh Judicial Circuit; ED BRODSKY, in his official capacity as State Attorney for Florida's Twelfth Judicial Circuit; SUSAN LOPEZ, in her official capacity as State Attorney for Florida's Thirteenth Judicial Circuit; LARRY BASFORD, in his official capacity as State Attorney for Florida's Fourteenth Judicial Circuit; DAVID ARONBERG, in his official capacity as State Attorney for Florida's Fifteenth Judicial Circuit; DENNIS WARD, in his official capacity as State Attorney for Florida's Sixteenth Judicial Circuit; HAROLD F. PRYOR, in his official capacity as State Attorney for Florida's Seventeenth Judicial Circuit; PHIL ARCHER, in his official capacity as State Attorney for Florida's Eighteenth Judicial Circuit; THOMAS BAKKEDAHL, in his official capacity as State Attorney for Florida's Nineteenth Judicial Circuit; AMIRA A. FOX, in her official capacity as State Attorney for Florida's Twentieth Judicial Circuit,

      Defendants.

## NATURE OF ACTION

1.      Plaintiffs the National Fair Housing Alliance ("NFHA"), Housing Opportunities Project for Excellence, Inc. ("HOPE"), the Fair Housing Center of the Greater Palm Beaches ("FHCGPB"), the Asian Real Estate Association of America ("AREAA"), and King Realty Advisors LLC bring this action to challenge §§ 692.203 and 692.204 of Florida Senate Bill 264 ("SB 264") codified at Fla. Stat. Ann. § 692.201 *et seq.*, which have the purpose and effect of discriminating on the basis of national origin in violation of the federal Fair Housing Act and Article I, section 2 of the Florida Constitution and violate the right to property guaranteed by Article I, section 2 of the Florida Constitution.

## INTRODUCTION

2.      On May 9, 2023, Florida Governor Ron DeSantis signed into law a slate of legislation and executive action expressly designed to target people from China, Russia, Cuba, Venezuela, North Korea, Syria, and Iran. Chief among these bills was SB 264, which became law on July 1, 2023. Subject to an extremely narrow exception, the law (1) prohibits anyone who is a "member of the People's Republic of China," a member of any political party in China, or domiciled in China (and not a U.S. citizen or lawful permanent resident) from purchasing property in Florida, and (2) restricts purchases of real property within ten miles of "critical infrastructure facilities" or military installations by "foreign principals" of China, Russia, Iran, North Korea, Cuba, Venezuela, and Syria (referred to herein as "targeted countries"). "Foreign principals" include individuals domiciled in a targeted country (and not a U.S. citizen or lawful permanent resident) or a member of a political party in a targeted country.

3.       The punishments for violating the law are severe: SB 264 makes it a felony for any member of the People's Republic of China, any member of a political party in China, or any person who is not a U.S. citizen or lawful permanent resident domiciled in China to purchase real

1

property in violation of the law. It makes it a misdemeanor for a "foreign principal" of any of the seven targeted countries to purchase real property in violation of the law. Real property acquired in violation of the law may be forfeited to the state.

4.    SB 264 is based on stereotyped and xenophobic generalizations and is transparently motivated by discrimination against people from the seven targeted countries based on their national origin. Throughout Governor DeSantis's initial press conference about the bill he invoked insidious stereotypes, accusing Chinese people of "worming" their way into American society. The bill's sponsor, Senator Jay Collins, similarly characterized people affected by the bill as "foreign agents." These same supporters ignored the discriminatory language and consequences of the legislation that opponents, including other members of the Florida House of Representatives, described as "plain on the face of the bill."

5.    The law singles out people from the seven targeted countries. For example, the ban on purchases by "member[s] of the People's Republic of China" affects all Chinese citizens—and only Chinese citizens. Both common sense and available data indicate that Chinese citizens are primarily people of Chinese national origin.

6.    The people affected by SB 264 because they are domiciled in or a member of a political party in one of the seven targeted countries are also overwhelmingly more likely to be of the national origin of those seven targeted countries as compared to people unaffected by the law.

7.    Even if the legislature did not intend to target individuals from these seven countries, which it clearly did, the bill has a massively disproportionate effect on people with a national origin of the seven countries.

8.      The limitations on purchasing property that are created by the law are substantial. Restrictions on real property purchases near military installations or critical infrastructure cover over 76% of Florida's land, where 98.85% of the population lives. This restricted territory is shown in blue (the ten-mile buffer zones) and red (military installations) on the map below:



9.      When combined with existing prohibitions on developing Florida conservation land and SB 264's own restrictions on purchases of agricultural land, the limitations on "foreign principal" ownership prohibit purchases of 97% of Florida's land.

10.     SB 264 forces sellers of real property and real estate professionals involved in the sale of real property to choose between compliance with federal law and compliance with SB 264. The Fair Housing Act of 1968 ("FHA") prohibits discrimination on the basis of national origin in the sale of residential property, but SB 264 requires real estate professionals to engage in just such discrimination: The law forces real estate professionals to identify people they perceive as being from one of the seven targeted countries; ask them about their immigration status, including whether they are U.S. citizens or lawful permanent residents; ask them about

where they are domiciled; and refuse to help those who are defined as "foreign principals" under the law to purchase property if it is within ten miles of a critical infrastructure facility or military installation unless a narrow exception applies. If they knowingly sell a property in violation of SB 264, they and the seller face criminal penalties.

11.     SB 264 explicitly targets for disfavored treatment individuals from the seven targeted countries while imposing no similar restrictions on nationals of any other country.

12.     Due to the discriminatory intent and effect of SB 264, Plaintiffs seek a declaratory judgment that SB 264 violates the FHA and Article 1, section 2 of the Florida Constitution and an injunction prohibiting enforcement of the law.

PARTIES

## I.     PLAINTIFFS

13.     Plaintiff National Fair Housing Alliance, Inc., is a national, nonprofit public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C. NFHA's mission is to end housing segregation and ensure equal housing opportunities for all people and communities through its education and outreach, member services, public policy, advocacy, housing and community development, tech equity, enforcement, and consulting and compliance programs. NFHA represents approximately 70 private, nonprofit fair housing organizations or operating members,101 supporting member organizations throughout the country, and 80 individual members.

14.     NFHA is the only national organization dedicated solely to ending housing discrimination and promoting residential integration. NFHA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

15.     Plaintiff Housing Opportunities Project for Excellence, Inc. is a nonprofit fair housing organization incorporated in the State of Florida and with principal offices in Miami and Sunrise, Florida. HOPE was the first nonprofit fair housing agency organized in the state of Florida and maintains a mission of fighting housing discrimination—including on the basis of national origin—in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida, regardless of national origin and other protected characteristics.

16.     One of HOPE's goals is the elimination of existing segregation and laws, policies, and acts that perpetuate segregation in housing; to that end, HOPE promotes residential integration. HOPE administers programs designed to prevent and eliminate discriminatory housing practices and maintains counseling and referral services related to myriad housing concerns. HOPE receives fair housing complaints, investigates them, and counsels and advocates for individuals who have been victims of housing discrimination. HOPE conducts educational programs and activities including, but not limited to, trainings, information sessions, and community events for the general public and the real estate industry. HOPE has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

17.     Plaintiff Fair Housing Center of the Greater Palm Beaches is a nonprofit organization incorporated in Florida with its principal place of business in Lake Worth, Florida. FHCGPB is dedicated to ensuring fair and affordable housing opportunities for all people by promoting culturally diverse communities through open housing and the elimination of all barriers to that goal. FHCGPB's mission is to eliminate segregation in housing and promote residential integration. In pursuit of that mission, FHCGPB provides fair housing counseling and

education, investigates and refers fair housing complaints against individual housing providers, and assists in pursuing fair housing enforcement through the courts and administrative processes. FHCGPB has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

18.     Plaintiff Asian Real Estate Association of America is a national nonprofit membership organization of real estate professionals dedicated to improving the lives of the Asian American, Native Hawaiian, and Pacific Islander community through home ownership. AREAA is incorporated in California with its principal offices in San Diego, California.

19.     AREAA has approximately 19,000 members and 45 chapters throughout the United States, including chapters based in Jacksonville, Miami, Orlando, and Tampa Bay. AREAA members, including the broker and owner of Plaintiff King Realty Advisors LLC have been injured by losing potential and pending transactions and potential and expected commissions as a result of SB 264.

20.     AREAA's mission is to increase home ownership among Asian Americans, Native Hawaiians, and Pacific Islanders by being a powerful national voice for housing, real estate, and housing finance professionals serving those markets. These new homeowners encouraging the growth and stability of their communities by infusing investment into them. The organization advances its mission through a variety of means, including lobbying members of Congress; meeting with government agencies; and working with other professional organizations like the National Association of Realtors on topics of shared interest. It also educates its members and other interested professionals about how to best work with Asian immigrant

communities. AREAA has also educated federal agencies such the Office of the Comptroller of the Currency and the Federal Housing Finance Agency about the effect of racial discrimination in housing on Asian Americans, Native Hawaiians, and Pacific Islanders.

21.     Plaintiff King Realty Advisors LLC is a real estate brokerage licensed to do business in Florida. The company has lost business and been unable to complete scheduled transactions with at least one Chinese citizen as a result of SB 264. The principal of King Realty Advisors, Inc., Hao Li, is a member of Plaintiff AREAA.

## II.     DEFENDANTS

22.     Defendant J. Alex Kelly is the Florida Secretary of Commerce and head of the Florida Department of Commerce. Fla. Stat. Ann. §§ 20.60(1)-(2). SB 264 assigns partial responsibility for implementing SB 264 to the Department of Economic Opportunity. *Id.* §§ 692.203(3)(a), (10), 692.204(7)(b), (10). On July 1, 2023, the Department of Economic Opportunity was renamed the Florida Department of Commerce. SB 264 requires the Department of Commerce to adopt rules implementing §§ 692.203 and 692.204, *see id.* §§ 692.203(10), 692.204(10), and requires a person restricted from purchasing property by SB 264 to register with the Department of Commerce if they owned real property in Florida on or before July 1, 2023, or legally acquire real property in Florida other than a *de minimis* indirect interest, *id.* §§ 692.203(3)(a), 692.204(4)(a). The Department of Commerce may initiate a civil action for the forfeiture of property acquired in violation of SB 264. *Id.* §§ 692.203(7)(b), 692.204(7)(b). Under Defendant Kelly's tenure, the Department of Commerce has adopted regulations implementing SB 264. Defendant Kelly is being sued in his official capacity as the Florida Secretary of Commerce and head of the Florida Department of Commerce.

23.     Defendant Patricia Fitzgerald is Chair of the Florida Real Estate Commission ("FREC"). In that role, she may exercise all of FREC's powers, except disciplinary and

7

rulemaking powers. *Id.* § 475.03. Under SB 264, FREC is responsible for adopting regulations establishing the form of an affidavit that buyers of real property within Florida must execute that states that the buyer may legally purchase property under the terms of SB 264 itself. *Id.* §§ 692.203(6)(c), 692.204(6)(c). Regulations adopting the form of the affidavit came into effect on January 17, 2024. *See* FAR 61J2-10.200. Defendant Fitzgerald is being sued in her official capacity as Chair of FREC.

24.     Pursuant to Article V, § 17 of the Florida Constitution, the state attorney for each judicial circuit is the prosecuting officer of all trial courts in that circuit and thus is responsible for prosecution of the criminal provisions of SB 264. As such, each of Florida's state attorneys named in paragraph 37(a)-(t) are defendants in their official capacities:

    a. Defendant Ginger Bowden Madden is the State Attorney for Florida's First Judicial Circuit.

    b. Defendant Jack Campbell is the State Attorney for Florida's Second Judicial Circuit.

    c. Defendant John Durrett is the State Attorney for Florida's Third Judicial Circuit.

    d. Defendant Melissa Nelson is the State Attorney for Florida's Fourth Judicial Circuit.

    e. Defendant Bill Gladson is the State Attorney for Florida's Fifth Judicial Circuit.

    f. Defendant Bruce L. Bartlett is the State Attorney for Florida's Sixth Judicial Circuit.

    g. Defendant R.J. Larizza is the State Attorney for Florida's Seventh Judicial Circuit.

    h. Defendant Brian S. Kramer is the State Attorney for Florida's Eighth Judicial Circuit.

i.  Defendant Andrew A. Bain is the State Attorney for Florida's Ninth Judicial
    Circuit.

j.  Defendant Brian Haas is the State Attorney for Florida's Tenth Judicial Circuit.

k.  Defendant Katherine Fernandez-Rundle is the State Attorney for Florida's
    Eleventh Judicial Circuit.

l.  Defendant Ed Brodsky is the State Attorney for Florida's Twelfth Judicial Circuit.

m.  Defendant Susan Lopez is the State Attorney for Florida's Thirteenth Judicial
    Circuit.

n.  Defendant Larry Basford is the State Attorney for Florida's Fourteenth Judicial
    Circuit.

o.  Defendant David Aronberg is the State Attorney for Florida's Fifteenth Judicial
    Circuit.

p.  Defendant Dennis Ward is the State Attorney for Florida's Sixteenth Judicial
    Circuit.

q.  Defendant Harold F. Pryor is the State Attorney for Florida's Seventeenth Judicial
    Circuit.

r.  Defendant Phil Archer is the State Attorney for Florida's Eighteenth Judicial
    Circuit.

s.  Defendant Thomas Bakkedahl is the State Attorney for Florida's Nineteenth
    Judicial Circuit.

t.  Defendant Amira D. Fox is the State Attorney for Florida's Twentieth Judicial
    Circuit.

## JURISDICTION AND VENUE

25.     The Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C.

§§ 1331, 1343, 1367, 2201, and 2202.

26.     This Court has supplemental jurisdiction over Plaintiffs' claims arising under

Article I, section 2 of the Florida state constitution, pursuant to 28 U.S.C. § 1367, because those

claims form part of the same case or controversy arising under this Court's original jurisdiction.

27.     This Court has personal jurisdiction over Defendants, all of whom are elected or

appointed Florida state officials, working or residing in Florida. The Court's exercise of

jurisdiction over Defendants in their official capacities as Florida state government officials is

appropriate pursuant to *Ex Parte Young*, 209 U.S. 123 (1908).

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial

part of the events or omissions giving rise to the claims occurred in the judicial district in which

this Court is based.

## FACTUAL BACKGROUND

## I.     FLORIDA'S HISTORY OF ALIEN LAND LAWS

29.     Laws restricting property ownership by noncitizens have long been used as a tool

to discriminate on the basis of national origin. The laws, commonly described as "alien land

laws," have frequently targeted noncitizens from particular countries or groups of countries

based on animosity toward particular racial and ethnic groups, particularly people of Asian

descent.

30.     In 1913, California enacted the first alien land law. The purpose of the law was to

deter Japanese immigrants from settling in California, but the law had the effect of barring

Asians from owning land in California more broadly. California tightened the law further in

1920 and 1923, barring the leasing of land and land ownership by American-born children of Asian immigrant parents or by corporations controlled by Asian immigrants.

31.     In 1926, an amendment was added to the Florida constitution modeled on the racist and xenophobic California alien land law, affording the legislature the "power to limit, regulate and prohibit the ownership, inheritance, disposition, possession and enjoyment of real estate in the State of Florida by foreigners who are not eligible to become citizens of the United States[.]" As was the case with many alien land laws of the time, the Florida amendment used the language of "foreigners" ineligible for citizenship because Asian residents primarily fell into that category.

32.     Florida was the last state to repeal its alien land law. In 2017, the Florida Constitution Revision Commission proposed a constitutional amendment to repeal the 1926 amendment, noting that it was discriminatory. The proposed amendment was approved by the electorate in 2018.

## II.     SB 264'S PROVISIONS

33.     On May 9, 2023, Florida Governor Ron DeSantis signed SB 264[1] into law as part of a slate of legislation and executive actions targeting individuals from seven "foreign countries of concern" defined as the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the Venezuelan regime of Nicolás Maduro, and the Syrian Arab Republic.

34.     SB 264 restricts individuals from the seven targeted countries from owning or purchasing most parcels of real property in the state of Florida. The law has three substantive sections with two addressing the ownership and purchase of agricultural land[2] and real property

---

[1] As used herein, "SB 264" refers to Fla. Stat. Ann. §§ 692.201-692.204.
[2] This Complaint does not challenge § 692.202, which relates exclusively to agricultural land.

by people and entities associated with any of the seven "foreign countries of concern" and one specific to the ownership and purchase of real property by people and entities associated with China.

**A.  Restrictions Targeted at Individuals of Chinese National Origin**

35.     SB 264 prohibits certain categories of people associated with China from owning, having a controlling interest in, or acquiring more than a *de minimus* indirect interest[3] in real property in Florida, subject to a narrow exception. These categories include:

a.      <u>Any "member of the People's Republic of China."</u> SB 264 does not define "member of the People's Republic of China," and it is properly understood within the context of other provisions of SB 264 as applying to any citizen of China. Lawful permanent residents from China who live in the United States and Florida remain Chinese citizens, as do those with pending asylum applications living in the United States while fleeing political and religious persecution in China. *See* Fla. Stat. Ann. § 609.204(1)(a)(1).

b.      <u>Any member of the Chinese Communist Party or of any other political party in the People's Republic of China.</u>  Since 1956, the CCP has permitted only Chinese citizens to join the Party. Approximately 98% of members of officially recognized parties in the country are members of the Chinese Communist Party. SB 264's prohibition also applies to members of China's eight non-opposition parties and members of Hong-Kong based political parties, including pro-democracy political parties that have

---

[3] Under SB 264, a person has a *de minimus* indirect interest only if the ownership is the result of ownership of registered equities in a publicly traded company owning the land and the person's ownership interest in the company 1) is less than 5% or 2) is a noncontrolling interest in an entity that is registered with the U.S. Securities and Exchange Commission and is not a foreign entity.

subsequently been banned or whose leaders have been jailed as a result of their opposition to the government of Hong Kong and the Chinese Communist Party. *Id.* 609.204(1)(a)(2).

c.      Any person domiciled in the People's Republic of China who is not a citizen or lawful permanent resident of the United States. This provision applies to all non-U.S. citizens and lawful permanent residents whose permanent homes are in China, including those who are lawfully present in the United States on nonimmigrant visas such as student visas, domestic employment and seasonal worker visas, and visas for victims of criminal activity and human trafficking. All such visas are temporary, and some are available only to people who declare that they do not intend to remain permanently in the United States. Students and seasonal workers, for instance, must have "a residence in a foreign country which [they] ha[ve] no intention of abandoning." Under Florida law, persons present in the United States on a nonimmigrant visa must remain domiciled in their country of origin. Individuals seeking asylum in the United States are also considered domiciled in their country of origin until their application is adjudicated and asylum is granted. *Id.* § 609.204(1)(a)(4).

36.      SB 264 also prohibits real property ownership by entities owned or controlled by people in the above categories. *Id.* § 609.204(1)(a)(5).

37.      If a person acquires or holds property in violation of the provisions targeting individuals associated with China, the property may be forfeited to the State of Florida. *Id.* § 609.204(7).

38.      Any person subject to the China-specific provisions, which apply across the entire state, who owned real property in Florida before the SB 264 effective date of July 1, 2023, or

13

who legally acquires property under the narrow exception to the ban on purchases of real property must register themselves and their property with the Department of Commerce. *Id.* § 609.204(4)(a). Individuals who do not comply with the registration requirement are subject to a daily fine of $1,000 per day if the registration is late. *Id.* § 609.204(4)(b).

39.     A person subject to the China-specific provisions may legally acquire real property in Florida by devise or descent, through the enforcement of security interests, or through the collection of debts, but must divest of that interest within three years. *Id.* § 609.204(5).

40.     A violation of the China-specific provisions of SB 264 constitutes a felony of the third degree, punishable by imprisonment for up to five years and a fine of up to $5,000. *Id.* § 609.204(8).

41.     A seller's knowingly selling property to a citizen or "foreign principal" of China constitutes a misdemeanor of the first degree. *Id.* § 609.204(9).

42.     SB 264 also subjects real estate professionals to criminal liability for knowingly selling property to a citizen or "foreign principal" of China in violation of the SB 264.[4] *Id.*

**B. Restrictions Targeted at People Originating from the Any of the "Foreign Countries of Concern"**

43.     SB 264 limits the ownership and purchase of real property in Florida by "foreign principals" of the targeted countries, who are defined, *inter alia*, as persons who are members of any political party in one of the seven targeted countries or who are not U.S. citizens or lawful

---

[4] Regulations create a rebuttal presumption that, if a closing agent relies on and maintains an affidavit of compliance from a "foreign principal" of a targeted country, then there is a rebuttable presumption that the closing agent did not knowingly sell to that "foreign principal." *See* FAC § 74C-60.007. However, the regulations do not create such rebuttal presumption with respect to citizens and "foreign principals" of China.

permanent residents and are "domiciled" in one of the seven targeted countries. *Id.* §§ 609.201(3),(4), 609.203(1).

44.     SB 264 domicile provisions applies to all persons whose permanent homes are in one of the seven countries, including people lawfully in the United States on nonimmigrant visas. Individuals seeking asylum in the United States are also considered domiciled in their country of origin until their application is adjudicated and asylum is granted.

45.     SB 264 restricts "foreign principals" from owning, purchasing, or acquiring more than a *de minimus* indirect interest in real property within ten miles of (1) a "critical infrastructure facility" or (2) a "military installation." *Id.* § 609.203(1).

46.     These terms are defined so broadly that SB 264's ten-mile restriction effectively bars the purchase of any residential property in the state by any "foreign principal."

47.     The blue and red areas in the map below reflect the areas within ten miles of either a "critical infrastructure facility" or a "military installation."



48.     Pursuant to SB 264, "critical infrastructure facilities" include chemical manufacturing facilities, refineries, electrical power plants, water treatment facilities, natural gas terminals, telecommunications central switch offices, gas processing plants, seaports, spaceport territories, and airports. *Id.* § 609.201(5). Approximately 75% of the entire state of Florida is within ten miles of a critical infrastructure facility and nearly 99% of current residential land is within ten miles of a critical infrastructure facility. There are 163 airports, 16 seaports, 277 chemical manufacturing facilities, and 458 water treatment facilities located in Florida.

49.     The blue shaded area in the map below reflects the territory within ten miles of "critical infrastructure facilities" in Florida.



50.     There are 74 military installations in Florida and approximately 45% of the state's population is within ten miles of a military installation.

51.     The blue and red shaded areas in the map below reflect the territory within ten miles of a "military installation" in Florida.

16



52.     The vast majority of Florida's major metropolitan areas, including Jacksonville, Miami, Tampa, Orlando, and St. Petersburg are in within ten miles of a critical infrastructure facility or military installation and 65% of all Florida cities are entirely within ten miles of a critical infrastructure facility or military installation.

53.     When this ten-mile zone is combined with SB 264's prohibitions on the purchase of agricultural land and the existence of Florida conservation land that cannot be developed, SB 264 restricts purchases in virtually the entire state, including the state's major metropolitan areas. The map below shows in red all Florida land that is either conservation land or blocked from purchase by SB 264:

17



54.     A "foreign principal" may legally acquire real property within ten miles of a military installation or critical infrastructure by devise or descent, through the enforcement of security interests, or through the collection of debts, but must divest of that interest within three years. *Id.* § 609.203(4).

55.     Any "foreign principal" who owned property in Florida within ten miles of a military installation or critical infrastructure facility before the SB 264 effective date of July 1, 2023, or who legally acquires property under the narrow exception to the ban on purchases of real property must register themselves and their property with the Department of Commerce. Individuals who do not comply with the registration requirement are subject to a daily fine of $1,000 per day if the registration is late. *Id.* 609.203(3).

56.     A seller's knowingly selling property to a "foreign principal" of a targeted country constitutes misdemeanor of the second degree. *Id.* 609.203(9).

57.     SB 264 also subjects real estate professionals to criminal liability for knowingly selling property to a "foreign principal" in violation of the SB 264. *Id.* If a closing agent relies on and maintains an affidavit of compliance from the buyer, then there is a rebuttable presumption that they did not act knowingly. *See* FAC § 74C-60.007.

**C.  SB 264 Requirements for All Covered Individuals**

58.     All buyers of real property in Florida must provide an affidavit attesting under penalty of perjury that they are permitted to purchase that property by SB 264 ("affidavit of compliance"). Fla. Stat. Ann. §§ 609.203(5)(a), 609.204(6)(a). Specifically, the buyer must attest in the affidavit of compliance that they are not a covered individual—*i.e.* a Chinese citizen or "foreign principal" of a targeted country—or, if they are a covered individual, that they qualify for an exception under SB 264. *Id.* §§ 609.203(5)(a), 609.204(6)(a). The affidavit of compliance must be in a form that is compliant with the regulations adopted by the Florida Real Estate Commission. *Id.* §§ 609.203(5)(c), 609.204(6)(c).

59.     SB 264 includes a narrow exception that allows covered individuals to purchase a single residential property of less than two acres in their own name as long as (1) the property is not within five miles of any military installation, and (2) they have been granted asylum in the United States or have a current verified United States visa (other than a tourist visa) that authorizes them to be in Florida. *Id.* §§ 609.203(4), 609.204(2). This small residential property exception does not apply in most of Florida's major metropolitan areas, including Jacksonville, Miami, Tampa, Orlando, and St. Petersburg because they are within five miles of a military installation.

60.     If a covered individual acquires property in violation of SB 264 law, then the property may be forfeited to the state. *Id.* §§ 609.203(7), 609.204(7).

### III.   INTENTIONAL DISCRIMINATION IMBUED SB 264 FROM INCEPTION TO ENACTMENT

61.     On September 22, 2022, Governor DeSantis proposed legislation prohibiting purchases of land by China and other "foreign countries of concern" as a part of a set of legislation and executive actions expressly designed to target people from these countries. In his remarks, Governor DeSantis invoked pernicious stereotypes of Chinese people, accusing China of "worming its way" into American society.

62.     In announcing the proposed legislation, Governor DeSantis expressed hostility toward people of Chinese national origin and repeatedly conflated all Chinese people with the Chinese state or the Chinese Communist Party, regardless of where they lived, their political leanings, or their connection to the Chinese Communist Party. For example, Governor DeSantis characterized people affected by the law—all Chinese citizens—as "Chinese agents" and "international foes." By conflating individuals of Chinese national origin with a hostile foreign government, Governor DeSantis invoked a xenophobic and dehumanizing stereotype of Chinese people as perpetual foreigners who will always be at behest of the governments of their country of origin, cannot be trusted to be loyal to the United States, and will never be "real Americans."

63.     On March 2, 2023, SB 264 and its companion measure, HB 1355, were introduced to the Florida Senate and House of Representatives. After several rounds of committee hearings in the spring of 2023, including significant debate sessions on March 14, 2023, and May 2 and 3, 2023, Governor DeSantis signed SB 264 into law on May 9, 2023.

64.     Throughout the legislative process, Florida legislators repeatedly made public statements demonstrating their hostility toward people from the targeted countries.

65.     During the March 14, 2023, Senate Judiciary Committee discussion of the bill, the bill's sponsor, Senator Jay Collins, villainized individual Chinese citizens in order to justify the

bill's prohibition on land ownership by people of Chinese national origin, asserting that "there are people who just don't believe in the American dream and the American way of life" and that they "simply don't stand up for our way of life, our thoughts or ideals…and principles."

66.     During the March 14, 2023, Senate Judiciary Committee discussion, Senator Lauren Book raised concerns that the bill could cause discrimination against individuals.

67.     Senator Collins responded that it was targeting "those countries that don't stand with U.S. thought process, how we live our life, how we do things…. They don't align with our U.S. interest." Senator Collins did not provide any evidence to support his sweeping, stereotyping claim.

68.     Senator Collins articulated a far-reaching negative description of Chinese people during a meeting of the Senate Committee on Rules on March 22, 2023. There, he described all people affected by the bill as "foreign agents."

69.     During the May 3, 2023 House discussion, Representative Daniel Alvarez contended that the bill was necessary because he could surveil military bases with equipment purchased at a store like Kmart, Florida; while indulging in casual xenophobia, he hyperbolically remarked, "Yes, I know Kmart's out. That's probably the Chinese fault too."

70.     Representative Katherine Waldron, one of the bill's co-sponsors, stated that she believed the people protesting against the bill before the House of Representatives State Affairs Committee on April 19, 2023, had been bussed from other parts of the country, implied that their motives were not genuine, and characterized them as "vocal and aggressive actors…who do not have our country's best interests in mind." The statements further played into stereotypes of people of Chinese descent as perpetual foreigners, eternally loyal to China and ultimately untrustworthy. A *Miami Herald* article quoting Representative Waldron noted that, in reality,

nearly everyone who testified on April 19, 2023, listed a Florida address and that the paper was able to quickly verify several addresses through home ownership records.

71.     On May 15, 2023, just days after the bill passed, co-sponsors again conflated these foreign states with all of their residents. Representatives Waldron and Borrero wrote that the bill would "restrict entities and people linked to the [Chinese Communist Party] and other foreign countries of concern from purchasing land in Florida near military bases or critical infrastructure."

### IV.     THE JUSTIFICATION FOR SB 264 IS DEFICIENT AND UNSUBSTANTIATED

72.     SB 264 lacks any basis in a substantial, legitimate, nondiscriminatory state interest.

73.     The sole justification advanced by SB 264's supporters, that of national security, was without any meaningful supporting evidence in the legislative record; instead, it rested upon illegitimate stereotypes.

74.     For example, although SB 264's prohibitions encompass residential property, the Bill Analysis and Fiscal Impact Statement introduced by Senators Collins and Avila, which puts forward the national security justification, did not even discuss residential property, let alone identify evidence that the purchase of residential property posed a security threat. While the report discussed the volume of agricultural property owned by foreign countries in the United States, it did not include the seven countries of interest as among countries with the highest ownership rates. Nor was there any evidence that showed, or even attempted to identify, the volume of residential property owned by Chinese citizens or "foreign principals" of any of the seven targeted countries either in Florida or nationally.

22

75.     Neither the Statement nor the bill distinguishes between purchases by individuals from the targeted countries as opposed to companies or government actors from the countries. Nor do they explain the reasons purchases by individuals allegedly threaten national security. Through multiple days of discussion in the Senate Committee on the Judiciary, Senate Committee on Rules, and the House of Representatives, SB 264's supporters never identified any national security threat posed by real property purchases by individuals from the seven targeted countries, many without any ties to the governments of their countries of origin.

76.     When asked about the impact of the bill on individuals seeking to purchase residential property, Representative Borrero, the bill's co-sponsor in the House, claimed that the bill did not target Chinese citizens or residents, just totalitarian regimes and the "Communist Party of China." The plain text of the bill, however, expressly restricts property ownership by individual people.

77.     Representative Waldron, one of the bill's co-sponsors in the House of Representatives expressly admitted that they had not identified any national security concerns in Florida emanating from Cuba, Russia, Venezuela, North Korea, Syria, or Iran.

78.     The complete failure to provide any justification for the scope of the bill demonstrates that the national security justification for the provisions of the bill that prohibit individuals from purchasing residential property is mere pretext.

79.     A basic analysis of the scope of the bill demonstrates that the bill restricts the property and ownership rights of individuals who do not pose national security threats.

80.     Individuals subject to the law from one of the seven targeted countries who are legally living, studying, or working in the United States on valid nonimmigrant visas are prohibited from owning or purchasing real property in Florida with very limited exceptions.

81.     Individuals subject to the law from one of the seven targeted countries who have current, verified United States nonimmigrant visas are prohibited from owning or purchasing real property in Florida with very limited exceptions even though they would have been subject to security screenings by the federal government, which approved their ability to legally reside in the United States on a temporary basis.

82.     Individuals who are members of political parties in active opposition to the governing parties in the seven targeted countries are subject to the law's ownership and purchase prohibitions.

83.     Individuals seeking asylum in the United States in an effort to escape persecution at the hands of the governing parties of the seven countries of concern are also subject to the law's ownership and purchase restrictions.

## V.     THE LEGISLATURE HAD LESS-DISCRIMINATORY AND LESS-RESTRICTIVE ALTERNATIVES AVAILABLE

84.     Despite the unsupported justification for SB 264, the Florida legislature failed to consider or adopt narrower, less discriminatory alternatives to achieve any possibly legitimate goals the legislature sought to serve with SB 264.

85.     Florida had many alternatives to SB 264. For example, the legislature could have passed a bill that restricted property ownership by the governments of and entities controlled by the seven listed countries, without targeting individuals from the countries in a broad, unnecessary sweep. Such a law would have advanced the legislature's claimed national security concerns without discriminating against or unduly restricting the rights of individuals.

86.     Florida could have exempted all residential property, fully exempted all holders of nonimmigrant visas and asylum-seekers, reduced the ten-mile scope of SB 264's restrictions, or

restricted certain purchases by persons with connections to foreign governments following an individualized analysis of security risks. It failed to do so.

**VI.     IN ENACTING SB 264, THE LEGISLATURE KNOWINGLY DISCRIMINATED AGAINST PERSONS ORIGINATING IN THE SEVEN TARGETED COUNTRIES**

87.     Members of the Florida legislature were well aware of the discriminatory effects of the bill and nonetheless chose to ignore them.

88.     On April 19, 2023, "more than 100 people spoke against the bill" before the House State Affairs Committee, "recounting the racial insults they've heard and asking lawmakers to vote against the measure" because, they said, "they were concerned it would lead to racial profiling." One community member recounted a stranger telling her 10-year-old son to "go back to China," and another expressly connected the bill to the anti-Asian racism he and his family experienced during the COVID-19 pandemic. The United Faculty of Florida, a union representing "thousands of international students and faculty" doing valuable academic work in the United States, cited the "xenophobia and hate that this bill actually encourages" in its opposition.

89.     Members of the legislature raised similar concerns. During the House of Representatives Session on May 2, 2023, Representative Anna Eskamani asked the bill's sponsor, Representative David Borrero, why the bill targeted Chinese people and expressed concerns that it may be unconstitutional.

90.     House Minority Leader Fentrice Driskell also repeatedly warned the Florida House of Representatives that the bill discriminated on the basis of national origin. During the House of Representatives Session on May 3, 2023, she noted that the bill does not define "member of the People's Republic of China," that "as best [as she] can tell it probably just means being a Chinese citizen," and that, when she asked the bill's sponsor whether it was possible to

25

be a lawful permanent resident of the United States and a "member of the People's Republic of China," the answer was yes. She continued, "That lets you know automatically that there's discrimination in this bill on [the basis of] national origin."

91.     She further observed that the bill's supporters were "not only ignoring" the discriminatory consequences but "doubling down."

92.     Representative Dotie Joseph reiterated concerns about national origin discrimination and recognized that the bill was an attempt to "target a particular group of people" based on their national origin. She observed that discrimination against people from the seven listed countries was "not [an] unintended consequence" of the legislation, but, rather, "plain on the face of the bill."

93.     Representative Robin Bartleman noted that she had originally been a cosponsor of the bill, but warned that the legislation would harm people and that the legislature had ignored people's "cries for help." She noted that "there were opportunities to listen to the concerns of so many citizens and permanent residents of our country" when they spoke about the consequences of the bill and that "perhaps [the legislature] should have listened to the informed legal opinions of so many attorneys about the words in this bill, including words like 'member of the People's Republic of China.'" Because "[t]here should be absolutely no risk of discriminating against people," she concluded that she "[could] not support this legislation in good conscience."

94.     Representative Marie Woodson stated that the bill's discriminatory terms could lead to racial profiling and national origin discrimination. Likewise, Representative Eskamani warned the bill could create an environment in which people refused to sell to all Asian-Americans.

95.     Representative Eskamani also raised concerns that the bill could "create an environment where someone does not want to sell to someone because they're Asian American because they will also be held liable for that. And that will create a discriminatory environment for anyone who looks Asian American." She described her own recent experiences of discrimination as an Iranian American and related those to the "constant discrimination" experienced by Asian Americans.

96.     The legislature's awareness of and deliberate indifference to the discriminatory nature and impact of SB 264 as described during hearings on the bill reflects the legislature's discriminatory intent in passing the bill.

## VII.  SB 264 HAS A DISPROPORTIONATE EFFECT BASED ON NATIONAL ORIGIN

97.     Even if SB 264 were a neutral policy in relation to national origin, which it is not, the law has an overwhelmingly disproportionate effect on people of Chinese, Russian, Iranian, North Korean, Cuban, Venezuelan, and Syrian national origin.

### A.  "Members" of the People's Republic of China

98.     SB 264 restricts purchases of real estate in Florida by all citizens of the People's Republic of China.

99.     Chinese citizens are overwhelmingly, if not almost entirely, of Chinese national origin. Only 0.1% of the population in China consists of international migrants, meaning people who were born outside of China.[5] In contrast, the remaining 99.9% of the population of China was born in the country. There is also no dual citizenship with China anywhere in the world.

---

[5] The United Nations defines an international migrant as any person who has changed their country of residence for any reason and, thus, was not born in the country of their current resident. Conversely, nonmigrants have not changed their residence and were born in the country where they current reside.

100.    In comparison, the vast majority of people who are not restricted from buying property by this section are not of Chinese national origin. According to U.N. migration data, approximately 60 million people of Chinese descent live outside of China. Even if every person of Chinese descent outside of China were no longer a citizen of China, only about 0.9% of the people in the world falling outside of the restrictions on "members" of the People's Republic of China would be of Chinese national origin. In contrast, among those unaffected by SB 264's provisions on "members" of the People's Republic of China—*i.e.*, those who are not Chinese citizens—99.9% are not of Chinese national origin.

|  | Covered by SB 264's China Citizenship Provision | Unaffected by SB 264's China Citizenship Provision |
|---|---|---|
| **% From China** | 99.9% | 0.9% |
| **% From All Other Countries** | 0.1% | 99.1% |

**B.  Provisions Based on Domicile**

101.    Individuals covered by SB 264's seven-country domicile-based restrictions on purchases of real property are disproportionately individuals of Chinese, North Korean, Russian, Iranian, Venezuelan, Cuban, or Syrian national origin and not of another national origin.

102.    Pursuant to SB 264, the domicile-based restrictions cover any person who is domiciled in one of the seven targeted countries unless that person is a U.S. citizen or lawful permanent resident.

103.    Under Florida law, a person retains their last domicile until they have established a new one, *i.e.*, they establish a new home in a different place and have an intent to remain there "permanently or indefinitely."

104.    Persons "domiciled" in the seven targeted countries therefore include not only the vast majority of persons residing in those countries, but also many emigrants from those

28

countries, including those coming to the United States or Florida specifically who have not or cannot yet acquire a new legal domicile.

### i. Worldwide

105.     SB 264's restrictions apply to individuals deemed to be "domiciled" in any of the seven targeted countries, regardless of whether they live in Florida, the United States, or elsewhere.

106.     There are 1,720,000,000 people with a national origin from one of the seven targeted countries. They comprise roughly 21% of the world's population.

107.     People from the seven targeted countries are far more likely than people from other countries to be restricted from purchasing property by SB 264's domicile provisions. People from the seven targeted countries constitute 99.0% of all people domiciled in one of the seven targeted countries, and thus restricted from purchasing property by the domicile provisions, and only 1% of the people who are not affected by SB 264's domicile provisions.

108.     In contrast, 98.2% of people who are unaffected by SB 264's domicile provisions are from other countries; just 1.8% of all people unaffected by domicile provisions are from the seven targeted countries.

|  | Covered by SB 264's Domicile Provisions | Unaffected by SB 264's Domicile Provision |
|---|---|---|
| **% From Targeted Countries** | 99.0% | 1.8% |
| **% From All Other Countries** | 1.0% | 98.2% |

109.     SB 264's domicile provisions also have a disproportionate effect on the basis of national origin of each of the seven targeted countries.

110.     The vast majority of non-U.S. citizens and non-lawful permanent residents "domiciled" in China—and therefore covered by SB 264—are from China.

111.    There are approximately 1.4 billion people currently residing in China. They comprise approximately 17.2% of the world's population.

112.    On information and belief, nearly all persons residing in China are "domiciled" there.

113.    Of the 1.4 billion people who reside in China, approximately 99.9% are nonmigrants and were therefore born in China. In comparison, very few persons residing in China are not from China. Approximately 0.1% of the people residing in China are international migrants and thus are not from China.

114.    In contrast, the vast majority of people who are not restricted from buying property in Florida by the China domicile provision are not from China. Currently, approximately 10.7 million people born in China live outside of China. Even if all of those people were no longer domiciled in China, which is an overestimate, they would constitute no more than 0.1% of the world population who do not live in China and are not affected by SB 264's domicile provisions. By comparison, more than 99.8% of people who are not domiciled in China and thus are unaffected by SB 264's China domicile provisions are not from China.

|  | Covered by China Domicile Provisions | Unaffected by China Domicile Provisions |
|---|---|---|
| % From China | 99.9% | 0.1% |
| % From All Other Countries | 0.1% | 99.8% |

115.    SB 264's domicile provision has a disproportionate effect on people of Russian national origin.

116.    The vast majority of non-U.S. citizens and non-lawful permanent residents "domiciled" in Russia—and therefore covered by SB 264—are from Russia.

30

117.     There are approximately 140.8 million people currently residing in Russia. They comprise approximately 1.7% of the world's population.

118.     On information and belief, nearly all persons residing in Russia are "domiciled" there.

119.     Of the 144.2 million people who reside in Russia, approximately 91.9% are nonmigrants and were therefore born in Russia. In comparison, very few persons residing in Russia are not from Russia. Approximately 8.1% of the people residing in Russia are international migrants and thus are not from Russia.

120.     In contrast, the vast majority of people who are not restricted from buying property in Florida because of the Russia domicile provision[6] are not from Russia. Currently, approximately 10.5 million people born in Russia live outside Russia. Even if all of those people were no longer domiciled in Russia, which is an overestimate, they would constitute no more than 0.1% of the world population who do not live in Russia and are not affected by SB 264. By comparison, more than 99.9% of people who are not domiciled in Russia and thus are unaffected by SB 264's Russia domicile provision are not from Russia.

|  | Covered by Russia Domicile Provision | Unaffected by Russia Domicile Provision |
|---|---|---|
| % From Russia | 91.9% | 0.1% |
| % From All Other Countries | 8.1% | 99.9% |

121.     SB 264's domicile provision has a disproportionate effect on people of Cuban national origin.

---

[6] This complaint uses the term "Russia domicile provision" to refer to the portions of SB 264 that have the effect of restricting an individual's ability to purchase real property in Florida based on their domicile in Russia.

122.    The vast majority of non-U.S. citizens and non-lawful permanent residents "domiciled" in Cuba—and therefore covered by SB 264—are from Cuba.

123.    There are approximately 11.0 million people currently residing in Cuba. They comprise approximately 0.1% of the world's population.

124.    On information and belief, nearly all persons residing in Cuba are "domiciled" there.

125.    Of the 11.0 million people who reside in Cuba, approximately 100% are nonmigrants and were therefore born in Cuba. In comparison, very few persons residing in Cuba are not from Cuba. Approximately 0% of the people residing in Cuba are international migrants and thus are not from Cuba.

126.    In contrast, the vast majority of people who are not restricted from buying property in Florida because of the Cuba domicile provision[7] are not from Cuba. Currently, approximately 1.6 million people born in Cuba live outside Cuba. Even if all of those people were no longer domiciled in Cuba, which is an overestimate, they would constitute no more than 0.02% of the world population who do not live in Cuba and are not affected by SB 264. By comparison, more than 99.98% of people who are not domiciled in Cuba and thus are unaffected by SB 264's Cuba domicile provisions are not from Cuba.

|  | Covered by Cuba Domicile Provision | Unaffected by Cuba Domicile Provision |
|---|---|---|
| **% From Cuba** | 100% | 0.02% |
| **% From All Other Countries** | 0% | 99.98% |

---

[7] This complaint uses the term "Cuba domicile provision" to refer to the portions of SB 264 that have the effect of restricting an individual's ability to purchase real property in Florida based on their domicile in Cuba.

127.    SB 264's domicile provision has a disproportionate effect on people of Venezuelan national origin.

128.    The vast majority of non-U.S. citizens and non-lawful permanent residents "domiciled" in Venezuela—and therefore covered by SB 264—are from Venezuela.

129.    There are approximately 30.5 million people currently residing in Venezuela. They comprise approximately 0.4% of the world's population.

130.    On information and belief, nearly all persons residing in Venezuela are "domiciled" there.

131.    Of the 30.5 million people who reside in Venezuela, approximately 95.4% are nonmigrants and were therefore born in Venezuela. In comparison, very few persons residing in Venezuela are not from Venezuela. Approximately 4.6% of the people residing in Venezuela are international migrants and thus not from Venezuela.

132.    In contrast, the vast majority of people who are not restricted from buying property in Florida because of the Venezuela domicile provision[8] are not from Venezuela. Currently, approximately 7.7 million people born in Venezuela live outside Venezuela. Even if all of those people were no longer domiciled in Venezuela, which is an overestimate, they would constitute no more than 0.09% of the world population who do not live in Venezuela and are not affected by SB 264. By comparison, more than 99.90% of people who are not domiciled in Venezuela and thus are unaffected by SB 264's Venezuela domicile provision are not from Venezuela.

---

[8] This complaint uses the term "Venezuela domicile provision" to refer to the portions of SB 264 that have the effect of restricting an individual's ability to purchase real property in Florida based on their domicile in Venezuela.

|  | Covered by Venezuela Domicile Provision | Unaffected by Venezuela Domicile Provision |
|---|---|---|
| **% From Venezuela** | 95.4% | 0.09% |
| **% From All Other Countries** | 4.6% | 99.90% |

133.    SB 264's domicile provision has a disproportionate effect on people from North Korea.

134.    The vast majority of non-U.S. citizens and non-lawful permanent residents "domiciled" in North Korean—and therefore covered by SB 264—are from North Korea.

135.    On information and belief, nearly all persons residing in North Korea are "domiciled" there.

136.    Of the 26.1 million people who reside in North Korea, approximately 99.8% are nonmigrants and were therefore born in North Korea. In comparison, very few persons residing in North Korea are not from North Korea. Approximately 0.2% of the people residing in North Korea are international migrants and thus are not from North Korea.

137.    In contrast, the vast majority of people who are not restricted from buying property in Florida because of the North Korea domicile provision[9] are not from North Korea. Currently, approximately 130,000 people born in North Korea live outside North Korea. Even if all of those people were no longer domiciled in North Korea, which is an overestimate, they would constitute no more than 0.002% of the world population who do not live in North Korea and are not affected by SB 264. By comparison, more than 99.99% of people who are not domiciled in North Korea and thus are unaffected by SB 264's North Korea domicile provision are not from North Korea.

---

[9] This complaint uses the term "North Korea domicile provision" to refer to the portions of SB 264 that have the effect of restricting an individual's ability to purchase real property in Florida based on their domicile in Russia.

|  | Covered by North Korea Domicile Provision | Unaffected by North Korea Domicile Provision |
|---|---|---|
| **% From North Korea** | 99.8% | 0.002% |
| **% From All Other National Origins** | 0.2% | 99.99% |

138.    SB 264's domicile provision has a disproportionate effect on people from Syria.

139.    The vast majority of non-U.S. citizens and lawful permanent residents "domiciled" in Syria—and therefore covered by SB 264—are from Syria.

140.    There are approximately 23.8 million people currently residing in Syria. They comprise approximately 0.3% of the world's population.

141.    On information and belief, nearly all persons residing in Syria are "domiciled" there.

142.    Of the 22.9 million people who reside in Syria, approximately 95.8% are nonmigrants and were therefore born in Syria. In comparison, very few persons residing in Syria are not from Syria. Approximately 4.2% of the people residing in Syria are international migrants and thus are not from Syria.

143.    In contrast, the vast majority of people who are not restricted from buying property in Florida because of the Syria domicile provision are not from Syria. Currently, approximately 8.2 million people born in Syria live outside Syria. Assuming that all of those people no longer domiciled in Syria, they constitute no more than 0.1% of the world population who do not live in Syria and are not affected by SB 264. By comparison, more than 99.9% of people who are not domiciled in Syria and thus are unaffected by SB 264's Syria domicile provisions are not from Syria.

|  | Covered by Syria Domicile Provision | Unaffected by Syria Domicile Provision |
|---|---|---|
| % From Syria | 95.8% | 0.1% |
| % From All Other Countries | 4.2% | 99.9% |

144.     SB 264's domicile provision has a disproportionate effect on people of Iranian national origin.

145.     The vast majority of non-U.S. citizens and non-lawful permanent residents "domiciled" in Iran—and therefore covered by SB 264—are from Iran.

146.     There are approximately 88.4 million people currently residing in Iran. They comprise approximately 1% of the world's population.

147.     On information and belief, nearly all persons residing in Iran are "domiciled" there.

148.     Of the 88.4 million people who reside in Iran, approximately 96.8% are nonmigrants and were therefore born in Iran. In comparison, very few persons residing in Iran are not from Iran. Approximately 3.2% of the people residing in Iran are international migrants and thus are not from Iran.

149.     In contrast, the vast majority of people who are not restricted from buying property in Florida because of the Iran domicile provision are not from Iran. Currently, approximately 1.3 million people born in Iran live outside Iran. Even if all of those people were no longer domiciled in Iran, which is an overestimate, they would constitute no more than 0.2% of the world population who do not live in Iran and are not affected by SB 264. By comparison, more than 99.8% of people who are not domiciled in Iran and thus are unaffected by SB 264's Iran domicile provisions are not from Iran.

|  | Covered by Iran Domicile Provision | Unaffected by Iran Domicile Provision |
|---|---|---|
| **% From Iran** | 96.8% | 0.2% |
| **% From All Other Countries** | 3.2% | 99.8% |

150.    Even if SB 264's domicile provisions apply only to people who are physically present in that country—as the concomitant regulations seem to suggest—then the domicile provisions would apply only to the current populations of the targeted countries, and the differential effect on national origin would be even greater.

### ii.  Florida and U.S. Data

151.    United States and Florida data confirm SB 264's disproportionate effect, as demonstrated by immigration data regarding individuals from targeted countries who have recently arrived in the United States.[10]

152.    Under federal law, nonimmigrant visas are temporary and so holders of such visas (*e.g.*, temporary workers or international students) cannot have an intent to remain "permanently or indefinitely" as required to establish a new domicile under Florida law. Federal law specifically requires that some nonimmigrant visa holders retain a "permanent residence" in their home country, thus keeping their domicile there, even if they are physically present in the United States.

153.    On information and belief, without any lawful U.S. immigration status, asylum-seekers are unable to form the requisite intent to establish a domicile in Florida even if they are physically present there. As a result, they would still be considered "domiciled" in their home country under Florida law, even if they are physically present in the U.S. and have fled from their home country.

---

[10] These data are unavailable for Iran, Syria, or North Korea.

154.    In 2021, admissions of nonimmigrant visa holders constituted 98.16% of all recent arrivals to the United States, *i.e.*, those who migrated in the past twelve months.

155.    Similarly, admissions of nonimmigrant visa holders constituted 99.23% of all recent arrivals to Florida in 2021.

156.    By imposing restrictions on persons domiciled in China, SB 264 has a disproportionate effect on people of Chinese national origin in Florida.

157.    Among persons residing in Florida, those most likely to be domiciled in China and thus subject to the China domicile provisions, are overwhelmingly of Chinese national origin. According to 2021 data from the American Communities Survey ("ACS"), 95.6% of recent arrivals to Florida from China were born in China and thus of Chinese national origin. These recent migrants were likely still domiciled in China both because of their recent arrival and the fact they overwhelmingly came on nonimmigrant visas.

158.    By comparison, only 4.4% of people who were recent arrivals from China to Florida, and thus likely still domiciled in China, were not born in China.

159.    In Florida, 0.6% of the total population is of Chinese descent and 0.2% of the population was born in China. Even if all the persons living in Florida of Chinese descent and/or born in China were considered not domiciled in China, at maximum 0.6% of the people unaffected by the China domicile provisions would be of Chinese national origin. By comparison, 99.4% of the people in Florida unaffected by the China domicile provision would not be of Chinese national origin.

160.    SB 264's China domicile provision similarly has a disproportionate effect on people of Chinese national origin across the United States.

161.     Among persons residing in the United States, those most likely to be domiciled in China, and thus subject to the China domicile provisions, are overwhelmingly of Chinese national origin. According to 2021 ACS data, 93.7% of recent arrivals from China to the United States were born in China and thus of Chinese national origin. These recent migrants were likely still domiciled in China both because of their recent arrival and the fact they overwhelmingly came on nonimmigrant visas.

162.     By comparison, only 6.3% of people who were recent arrivals from China to the United States, and thus likely still domiciled in China, were not born in China.

163.     In contrast, in the United States, 1.6% of the total population is of Chinese descent and 0.6% of the population was born in China. Even if all of the persons living in the United States of Chinese descent and/or born in China were considered not domiciled in China, at maximum 1.6% of the people unaffected by the China domicile provisions would be of Chinese national origin. By comparison, more than 98.4% of the people in the United States who are not affected by the China domicile provision are not of Chinese national origin.

164.     By imposing restrictions on persons domiciled in Russia, SB 264 has a disproportionate effect on people of Russian national origin in Florida.

165.     Among persons residing in Florida, those most likely to be domiciled in Russia, and thus subject to the Russia domicile provision, are overwhelmingly of Russian national origin. According to 2021 ACS data, 89.7% of recent arrivals from Russia to Florida were born in Russia and thus of Russian national origin. These recent migrants were likely still domiciled in Russia both because of their recent arrival and the fact they overwhelmingly came on nonimmigrant visas.

39

166.    By comparison, only 10.3% of people who were recent arrivals from Russia to Florida, and thus likely still domiciled in Russia, were not born in Russia.

167.    In Florida, 0.9% of the total population is of Russian descent and 0.1% of the population was born in Russia. Even if all the persons living in Florida of Russian descent and/or born in Russia were considered not domiciled in Russia, at maximum 0.9% of the people unaffected by the Russia domicile provisions would be of Russian national origin. By comparison, 99.1% of the people in Florida unaffected by the Russia domicile provision would not be of Russian national origin.

168.    SB 264's Russia domicile provision similarly has a disproportionate effect on people of Russian national origin across the United States.

169.    Among persons residing in the United States, those most likely to be domiciled in Russia, and thus subject to the Russia domicile provisions, are overwhelmingly of Russian national origin. According to 2021 ACS data, 88.2% of recent arrivals from Russia to the United States were born in Russia and thus of Russian national origin. These recent migrants were likely still domiciled in Russia both because of their recent arrival and the fact they overwhelmingly came on nonimmigrant visas.

170.    By comparison, only 11.8% of recent arrivals from Russia to the United States, who were thus likely still domiciled in Russia, were not born in Russia.

171.    In contrast, in the United States, 0.8% of the total population is of Russian descent and 0.12% of the population was born in Russia. Even if all the persons living in the United States of Russian descent and/or born in Russia were considered not domiciled in Russia, at maximum 0.8% of the people unaffected by the Russia domicile provisions would be of Russian

national origin. By comparison, 99.2% of the people in the United States who are not affected by the Russia domicile provision are not of Russian national origin.

172.    By imposing restrictions on persons domiciled in Cuba, SB 264 has a disproportionate effect on people of Cuban national origin in Florida.

173.    Among persons residing in Florida, those most likely to be domiciled in Cuba, and thus subject to the Cuba domicile provisions, are overwhelmingly of Cuban national origin. According to 2021 ACS data, 97.7% of people who were recent arrivals from Cuba to Florida were born in Cuba and are thus of Cuban national origin. These recent migrants were likely still domiciled in Cuba both because of their recent arrival and the fact they overwhelmingly came on nonimmigrant visas.

174.    By comparison, only 2.3% of people who were recent arrivals from Cuba to Florida, and thus likely still domiciled in Cuba, were not born in Cuba.

175.    In Florida, 7.8% of the total population is of Cuban descent and 4.5% of the population was born in Cuba. Even if all of the persons living in Florida of Cuban descent and/or born in Cuba are considered not domiciled in Cuba, at maximum 7.8% of the people unaffected by the Cuba domicile provisions would be of Cuban national origin. By comparison, 92.2% of the people in Florida unaffected by the Cuba domicile provision would be not of Cuban national origin.

176.    SB 264's Cuba domicile provision similarly has a disproportionate impact on people of Cuban national origin across the United States.

177.    Among persons residing in the United States, those most likely to be domiciled in Cuba, and thus subject to the Cuba domicile provisions, are overwhelmingly of Cuban national origin. According to 2021 ACS data, 96.2% of people who were recent arrivals from Cuba to the

United States were born in Cuba and thus of Cuban national origin. These recent migrants were likely still domiciled in Cuba both because of their recent arrival and the fact they overwhelmingly came on nonimmigrant visas.

178.    By comparison, only 3.8% of recent arrivals from Cuba to the United States, and were thus likely still domiciled in Cuba, were not born in Cuba.

179.    In contrast, in the United States, 0.8% of the total population is of Cuban descent and 0.39% of the population was born in Cuba. Even if all of the persons living in the United States of Cuban descent and/or born in Cuba were considered not domiciled in Cuba, at maximum 0.8% of the people unaffected by the Cuba domicile provisions would be of Cuban national origin. By comparison, more than 99.2% of the people in the United States who are not affected by the Cuba domicile provision are not of Cuban national origin.

180.    By imposing restrictions on persons domiciled in Venezuela, SB 264 has a disproportionate effect on people of Venezuelan national origin in Florida.

181.    Among persons residing in Florida, those most likely to be domiciled in Venezuela, and thus subject to the Venezuela domicile provisions, are overwhelmingly of Venezuelan national origin. According to 2021 ACS data, 93.0% of recent arrivals from Venezuela to Florida were born in Venezuela and are thus of Venezuelan national origin. These recent migrants were likely still domiciled in Venezuela both because of their recent arrival and the fact they overwhelmingly came on nonimmigrant visas or as asylum-seekers.

182.    By comparison, only 7.0% of people who were recent arrivals migrated from Venezuelan to Florida, and thus likely still domiciled in Venezuela, were not born in Venezuela.

183.    In Florida, 1.6% of the total population is of Venezuelan descent and 1.5% of the population was born in Venezuela. Even if all of the persons living in Florida of Venezuelan

descent and/or born in Venezuela were considered not domiciled in Venezuela, at maximum 1.6% of the people unaffected by the Venezuela domicile provisions would be of Venezuelan national origin. By comparison, 98.4% of the people in Florida unaffected by the Venezuela domicile provision would be not of Venezuelan national origin.

184.    SB 264's Venezuela domicile provision similarly has a disproportionate effect on people of Venezuelan national origin across the United States.

185.    Among persons residing in the United States, those most likely to be domiciled in Venezuela, and thus subject to the Venezuela domicile provisions, are overwhelmingly of Venezuelan national origin. According to 2021 ACS data, 93.7% of people who were recent arrivals from Venezuela to the United States were born in Venezuela and thus of Venezuelan national origin. These recent migrants were likely still domiciled in Venezuela both because of their recent arrival and the fact that they overwhelmingly came on nonimmigrant visas or as asylum-seekers.

186.    By comparison, only 6.3% of recent migrants from Venezuela to the United States, and were thus likely still domiciled in Venezuela, were not born in Venezuela.

187.    In contrast, in the United States, 0.2% of the total population is of Venezuelan descent and 0.2% of the population was born in Venezuela. Even if all of the persons living in the United States of Venezuelan descent and/or born in Venezuela were considered not domiciled in Venezuela, at maximum 0.2% of the people unaffected by the Venezuela domicile provisions would be of Venezuelan national origin. By comparison, 99.8% of the people in the United States who are not affected by the Venezuela domicile provision are not of Venezuelan national origin.

### C.  Provisions Targeting Members of Political Parties

188.    SB 264 contains a "political party provision," which places restrictions on the purchase of real property in Florida by any "member of a political party or any subdivision of a political party in a foreign country of concern."

189.    SB 264 does not define what constitutes membership in a political party in the seven targeted countries.

190.    The political party provision overwhelmingly applies to individuals of Chinese, Russian, Cuban, Venezuelan, North Korean, Syrian, or Iranian national origin, and not to individuals of another national origin.

191.    Upon information and belief, each targeted country requires people to be citizens of that country in order to join a political party. As a result, persons covered by the political party provision are all citizens of China, Russia, Cuba, Venezuela, North Korea, Syria, and Iran. In contrast, people who are unaffected by the political party provision overwhelmingly have another national origin.

192.    The China political parties provision has a disproportionate effect on people of Chinese national origin.

193.    Upon information and belief, at least 99.9% of citizens of China were born in China and thus are of Chinese national origin. Accordingly, approximately 99.9% of members of Chinese political parties are of Chinese national origin and no more than 0.1% of members of Chinese political parties are of another national origin.

194.    The population of China, overwhelmingly of Chinese national origin, comprises approximately 17.2% of the world's population. Even making the conservative assumption that every person living in China is *not* a member of a political party—an overestimate—and

accounting for Chinese nationals outside of China, not much more than 18% of the people unaffected by the China political parties provision could possibly be of Chinese national origin. In comparison, at least 80% of the people unaffected by the China political parties provision are of another national origin.

195.    The Russia political parties provision has a disproportionate effect on people of Russian national origin.

196.    Upon information and belief, at least 91.9% of citizens of Russia were born in Russia and thus are of Russian national origin. Accordingly, approximately 91.9% of members of Russian political parties are of Russian national origin and no more than 8.1% of members of Russian political parties are of another national origin.

197.    The population of Russia, overwhelmingly of Russian national origin, comprises approximately 1.7% of the world's population. Even making the conservative assumption that every person living in Russia is *not* a member of a political party—an overestimate—and accounting for Russian nationals outside of Russia, not much more than 2% or the people unaffected by the Russia political parties provision could possibly be of Russian national origin. In comparison, at least 98% of the people unaffected by the Russia political parties provision are of another national origin.

198.    The Cuba political parties provision has a disproportionate effect on people of Cuban national origin.

199.    Upon information and belief, approximately 100% of citizens of Cuba were born in Cuba and thus are of Cuban national origin. Accordingly, approximately 100% of members of Cuban political parties are of Cuban national origin and no more than 0% of members of Cuban political parties are of another national origin.

200.    People of Cuban national origin comprise approximately 0.1% of the world's population. Even making the conservative assumption that every person of Cuban national origin is *not* a member of a political party—an overestimate—at most, 0.1% of the people unaffected by the Cuba political parties provision could possibly be of Cuban national origin. In comparison, at least 99.9% of the people unaffected by the Cuba political parties provision are of another national origin.

201.    The Venezuela political parties provision has a disproportionate effect on people of Venezuelan national origin.

202.    Upon information and belief, approximately 95.4% of citizens of Venezuela were born in Venezuela and thus are of Venezuelan national origin. Accordingly, approximately 95.4% of members of Venezuelan political parties are of Venezuelan national origin and no more than 4.6% of members of Venezuelan political parties are of another national origin.

203.    People of Venezuelan national origin comprise approximately 0.4% of the world's population. Even making the conservative assumption that every person of Venezuelan national origin is *not* a member of a political party—an overestimate—at most, 0.4% of the people unaffected by the Venezuela political parties provision could possibly be of Venezuelan national origin. In comparison, at least 99.6% of the people unaffected by the Venezuela political parties provision are of another national origin.

204.    The North Korea political parties provision has a disproportionate effect on people of North Korea national origin.

205.    Upon information and belief, at least 99.8% of citizens of North Korea were born in North Korea and thus are of North Korean national origin. Accordingly, at least 99.8% of

members of North Korean political parties are of North Korean national origin and no more than 0.2% of members of North Korean political parties are of another national origin.

206.    People of North Korean national origin comprise approximately 0.3% of the world's population. Even making the conservative assumption that every person of North Korean national origin is *not* a member of a political party—an overestimate—at most, 0.3% of the people unaffected by the North Korea political parties provision could possibly be of North Korean national origin. In comparison, at least 99.7% of the people unaffected by the North Korea political parties provision are of another national origin.

207.    The Syria political parties provision has a disproportionate effect on people of Syrian national origin.

208.    Upon information and belief, at least 95.8% of citizens of Syria were born in Syria and thus are of Syrian national origin. Accordingly, at least 95.8% of members of Syrian political parties are of Syrian national origin and no more than 4.2% of members of Syrian political parties are of another national origin.

209.    People of Syrian national origin comprise approximately 0.3% of the world's population. Even making the conservative assumption that every person of Syrian national origin is *not* a member of a political party—an overestimate—at most, 0.3% of the people unaffected by the Syria political parties provision could possibly be of Syrian national origin. In comparison, at least 99.7% of the people unaffected by the Syria political parties provision are of another national origin.

210.    The Iran political parties provision has a disproportionate effect on people of Iranian national origin.

211.    Upon information and belief, at least 96.8% of citizens of Iran were born in Iran and thus are of Iranian national origin. Accordingly, at least 96.8% of members of Iranian political parties are of Iranian national origin and no more than 3.2% of members of Iranian political parties are of another national origin.

212.    People of Iranian national origin comprise approximately 1% of the world's population. Even making the conservative assumption that every person of Iranian national origin is *not* a member of a political party—an overestimate—at most, 1% of the people unaffected by the Iranian political parties provision could possibly be of Iranian national origin. In comparison, at least 99% of the people unaffected by the Iran political parties provision are of another national origin.

## INJURY TO PLAINTIFFS

### I.    FAIR HOUSING ORGANIZATIONS

213.    Plaintiffs NFHA, HOPE, and FHCGPB have suffered and will continue to suffer particularized and concrete injuries as a direct result of the SB 264's passage and implementation. SB 264 has frustrated and obstructed the organizations' missions and ongoing work, forcing them to divert their resources to identify and counteract the effect of SB 264, and curtailing their other activities and affecting demand for their services.

214.    NFHA, HOPE, and FHCGPB are all organizations with missions to ensure that people have equal opportunity in housing. The passage and enforcement of SB 264 substantively impairs NFHA, HOPE, and FHCGPB's missions by having the purpose and effect of discriminating on the basis of national origin, expressing preferences against homebuyers of particular national origins, and otherwise requiring and encouraging third parties involved in homebuying transactions to discriminate on the basis of national origin.

*NFHA*

215.    Plaintiff NFHA's mission of ending housing segregation and ensuring equal housing opportunities for all people and communities has been frustrated by the adoption and implementation of SB 264. The bill has interfered with NFHA's mission-related activities, impaired its ability to achieve its goals of ensuring equal access to housing opportunities, harmed the communities the organization serves by restricting people's ability to purchase homes on the basis of their national origin, and made it more difficult for NFHA to serve those communities.

216.    NFHA has been required to devote significant resources to identify and counteract the adverse effects of SB 264. NFHA has diverted its limited time and resources and incurred expenses engaging in education and outreach to prospective homebuyers to educate them regarding their fair housing rights in relation to SB 264, including: developing education and outreach strategy targeted to people affected by SB 264; designing and drafting education and outreach materials; placing social media advertisements on Facebook regarding fair housing rights targeted to persons affected by SB 264; planning for and implementing legislative advocacy activities; advocacy on the Preemption of Real Property Discrimination Act which would preempt any state or local law in the real estate market from discriminating against individuals based on their citizenship or national origin; developing education and outreach strategies for real estate professionals affected by SB 264; designing and drafting education and outreach materials targeted to real estate professionals with other fair housing organizations; and meeting with fair housing organizations to develop strategies to counteract the effects of SB 264.

217.    NFHA has also expended time and resources counseling real estate professionals and prospective homebuyers who have been affected by SB 264.

218.     These activities were direct responses to counteract the harm inflicted by SB 264 on community members. Had NFHA not engaged in these activities, SB 264 would have continued unabated to interfere with NFHA's mission-related activities, impair its ability to achieve its goals, harmed the communities it serves, and make it more difficult for NFHA to serve those communities.

219.     In carrying out these activities in response to SB 264, for which it had not budgeted time or money, NFHA was forced to divert significant staff time and funds away from other planned mission-related activities and programs.

220.     In particular, NFHA was required to delay counteracting design and construction practices that likely violate fair housing laws, postpone responding to leads regarding new potentially discriminatory eviction practices, and defer activities to identify real estate sales and rental practices that fail to comply with fair housing laws.

221.     The time and resources spent counteracting SB 264 through education and counseling also required NFHA to divert time and resources from planned grant project activities and contributed to seeking modification of grants, potentially putting grant funding at risk. Grants are one of the main sources of funding for the organization and NFHA's continued grants and funding sources are necessary for NFHA to continue operating and pursue its mission.

222.     The drain on staff time caused by having to investigate and counteract Defendants' discriminatory conduct affected planned programs and activities to build NFHA's organizational capacity and further NFHA's development goals. The drain on staff time caused NFHA to delay or curtail several operational programs and activities including updating NFHA's human resources policies and procedures, upgrading board of directors' orientation materials, implementing a comprehensive board development and training program, and developing and

implementing a succession planning process. The inability to complete these tasks as planned undermined NFHA's ability to function efficiently as an organization. The diversion of staff time and resources also caused NFHA to delay programs and activities supporting NFHA's development goals including creating and staffing an advisory council to assist NFHA in reaching its fundraising goals and researching the necessary steps, including appropriate policies and infrastructure, to establish an endowment for NFHA. The delay in completing these development programs and activities undercut NFHA's development goals, the achievement of which are necessary for NFHA's continued ability to operate, its long-term sustainability as organization and its ability continue to pursue its mission.

### *HOPE*

223.    The adoption and implementation of SB 264 has and continues to frustrate HOPE's mission of fighting housing discrimination and ensuring equal housing opportunities throughout Florida. SB 264 has interfered with HOPE's mission-related activities, impaired its ability to ensure equal access to housing opportunities, harmed the communities that HOPE serves, and made it more difficult for HOPE to serve those communities.

224.    SB 264 has required HOPE to devote significant time and resources to identify and counteract the adverse effects of the passage and implementation of SB 264. HOPE has a small staff and had to divert their limited time and resources and incur expenses to engage in education and outreach to prospective homebuyers and real estate professionals to educate them regarding their fair housing rights and responsibilities in relation to SB 264. Such education and outreach has included: developing an education and outreach strategy to counteract the effect of SB 264; designing and drafting education and outreach materials; placing advertisements in Chinese language publications in Florida regarding fair housing rights related to SB 264;

planning for and meeting with congressional representatives to discuss SB 264; researching and
drafting informational documents to educate the general public and real estate professionals
about fair housing rights and responsibilities after SB 264; reaching out to real estate
professional organizations regarding SB 264; attending and participating in a virtual town hall to
provide legislators with information and testimony about the effects of the bill; and organizing
and speaking at forums aimed at real estate professionals to educate them about their fair housing
rights under SB 264.

225.    HOPE has also been forced to divert its limited time and resources to counseling
real estate professionals and prospective homebuyers about their fair housing rights and
responsibilities in connection with SB 264 and staffing a hotline for individuals to report their
experiences and seek advice.

226.    In carrying out activities, for which it had not budgeted time or money, to
counteract the harm caused by SB 264, HOPE was forced to divert significant staff time and
funds away from other planned mission-related activities and programs. HOPE serves Miami-
Dade and Broward counties which have nearly five million people and has engaged in a
statewide education and outreach initiatives providing fair housing education and training to
underserved parts of Florida since 2011. HOPE was forced to forgo opportunities in education,
counseling, investigation, and capacity-building activities and services, the achievement of
which would have substantially furthered its organizational goals. For example, HOPE was
forced to curtail or delay additional training of housing providers and the opportunity to
collaborate with key stakeholders and develop or expand partnerships statewide to build upon an
infrastructure for the reporting of housing discrimination, identify new trends in housing
discrimination, and expand education of the public, industry, regulators, public policy leaders,

and others about the perpetuation of discriminatory housing practices. These educational efforts and partnerships would have been a primary means for the organization to provide fair housing-related information to the communities it serves. These efforts would have increased awareness and understanding of fair housing laws for both customers and housing providers and established the basis for future referrals and reporting of housing discrimination. The cancellation of these activities therefore reduces the number of people HOPE is able to serve.

227.    The drain on staff time caused by having to counteract SB 264 also affected HOPE's operations and funding. The time diverted to counteract SB 264 curtailed HOPE's fundraising and consulting, including identifying and applying for new grants and funding sources, and identifying, soliciting, and applying for funds from private donors and foundations to develop programs that align with HOPE's mission and funders' priorities. Grants and funding are the primary sources of income for the organization and applications for new grants and funding sources are necessary to HOPE's survival and ability to pursue its mission.

228.    HOPE is a membership organization. The time spent counteracting SB 264 meant that HOPE had less time to expand its membership base.

### FHCGPB

229.    The passage and implementation of SB 264 frustrates FHCGPB's mission of ensuring equal and affordable housing opportunities for all people by interfering with its mission and mission-related programs and activities, impairing its ability to achieve its goals of ensuring equal access to housing opportunities, harming the communities that it serves, and making it more difficult for FHCGPB to serve those communities.

230.    SB 264 has required FHCGPB to devote significant resources to identify and counteract adverse effects of the passage and implementation of SB 264. FHCGPB's small staff

had to divert their limited time and resources and incur expenses to engaging in education and outreach to prospective homebuyers and real estate professionals to educate them regarding their fair housing rights in relation to SB 264. Those efforts have included: developing education and outreach strategies; designing and drafting education and outreach materials; educating Florida residents on fair housing rights under SB 264 at homebuyer workshops; planning for and meeting with congressional representatives to discuss SB 264; educating Florida real estate professionals on their fair housing rights and responsibilities under SB 264; meeting with real estate professional group to design and implement education and outreach to Florida real estate professionals regarding their rights and responsibilities under SB 264; and participating in and speaking at a virtual town hall organized to provide legislators with information about the effects of the bill. FHCGPB has conducted fifteen presentations to community service providers, local housing providers and governmental agencies regarding SB 264.

231.    FHCGPB has also been required to counsel real estate professionals and residents in Florida regarding their fair housing rights under SB 264.

232.    These activities were direct responses to counteract the harm inflicted by SB 264 on community members. Had FHCGPB not engaged in these activities, SB 264 would have continued unabated to interfere with FHCGPB's mission-related activities, impair its ability to achieve its goals, harmed the communities it serves, and make it more difficult for FHCGPB to serve those communities.

233.    In carrying out activities, for which it had not budgeted time or money, to counteract the harm caused by SB 264, FHCGPB was forced to divert significant staff time and funds away from other planned activities. FHCGPB cancelled or curtailed several planned activities, including in-person education and outreach activities, and tester recruitment events.

FHCGPB's inability to engage in its typical activities for achieving its mission impaired its efforts to achieve its goals of ensuring equal access to housing opportunities. In particular, the time and resources spent counteracting SB 264 required the FHCGPB to divert time and resources from mission-related programs and activities to address the affordable housing crisis in Palm Beach County. FHCGPB is the only organization conducting these advocacy, education and outreach, counseling, and investigation activities in its service area. Consequently, FHCGPB was not able to provide residents within its service area with counseling, referral, advocacy, and other services, reducing the number of people served.

## II.     MEMBERSHIP ORGANIZATION

234.    AREAA is a national, non-profit membership organization of real estate professionals with members and chapters throughout the United States, including in Florida.

235.    AREAA's mission and its members have been directly harmed by the passage of SB 264.

236.    One AREAA member had been working with Chinese partners, who were not United States citizens and were based in China, to purchase 7.4 acres of land on which they planned to build and develop up to thirty homes. Prior to the passage of SB 264, the buyers had been negotiating over price. The AREAA member and her partners had expected to make a profit between $14 million and $20 million on the development.

237.    After the buyers and seller had reached agreement on the sale price and were close to executing a contract, the buyers realized that SB 264 might be an issue. Investigating further, this AREAA member and her business partners realized that the business partners were prohibited by SB 264 from purchasing the property and developing homes that could have provided housing to dozens of families from all backgrounds.

238.    As a result, the entire project fell apart and the AREAA member and her partner missed out on an expected profit of up to $20 million.

239.    A different AREAA member had identified a specific community in which the potential buyer wanted to purchase a home for a price of $2–3 million dollars.

240.    Upon information and belief, the AREAA member would have made more than $100,000 from the purchase.

241.    After several days of showing the potential buyer properties, the AREAA member learned that the purchaser was domiciled in China subject to the SB 264 restrictions and as a result the sale was not completed with the AREAA member real estate agent.

242.    Mr. Li is also a member of AREAA.

243.    SB 264 exposes AREAA members to legal liability and the threat of criminal punishment by requiring them to choose between acting in ways that violate the Fair Housing Act or facing criminal prosecution under SB 264.

244.    SB 264 requires real estate professionals to treat potential purchasers from China differently from potential borrowers from any other country in ways that constitute discrimination on the basis of national origin and are illegal under the Fair Housing Act.

245.    SB 264 requires real estate professionals to treat people who are not U.S. citizens or lawful permanent residents domiciled in the seven targeted countries differently than people who are not U.S. citizens or lawful permanent residents domiciled in any other country. These actions, likewise, violate the Fair Housing Act.

246.    SB 264 unlawfully requires certain members of AREAA and others engaged in the brokering of residential real property to discriminate in making available the purchase of

residential real property and/or discriminate in the terms or conditions of the purchase of residential real property based on race, color, or national origin in violation of the FHA.

247.    The law forces real estate professionals, including AREAA members, to identify people they perceive as being from one of the seven targeted countries; ask them about their immigration status, including whether they are U.S. citizens or lawful permanent residents; ask them about where they are domiciled; and refuse to help those who are defined as "foreign principals" under the law to purchase property if it is within ten miles of a critical infrastructure facility unless a narrow exception applies.

248.    SB 264 puts AREAA members in an impossible position, forcing them to choose between compliance with the FHA or SB 264. If they choose to violate the FHA in order to comply with SB 264, they risk legal liability, including civil lawsuits, 42 U.S.C. §§ 3612-3614, civil penalties, 24 CFR § 180.671, and, as Florida state professionals, license suspension or revocation, fines of up to $5,000 for each offense, and other disciplinary action. But if AREAA members refuse to comply with SB 264 in order to comply with the FHA, they risk criminal penalties either directly under SB 264 or for aiding and abetting a violation.

**III.    KING REALTY ADVISORS LLC**

249.    King Realty Advisors LLC has lost the profits from five to ten sales of real property as a result of SB 264.

250.    King Realty Advisors LLC does substantial business with members of the Chinese community in Florida, including through in-language outreach and advertising.

251.    For example, Mr. Li—who is the broker and owner of King Realty Advisors LLC—represented a buyer who is a Chinese citizen. The buyer signed a contract to purchase property in Polk County, Florida prior to July 1, 2023. Both Mr. Li's client and the seller of the property agreed to extend the closing date until after July 1, 2023. After that date—when SB 264

had gone into effect—the title company involved in the purchase stated that they could no longer complete the closing process. The company's attorney had advised it that SB 264's vague language created too much of a risk in selling to Mr. Li's buyer, a Chinese citizen, leading to the loss of the transaction and an ongoing civil action in Florida state court to recover the deposit Mr. Li and his client had already paid.

252.    Since the law went into effect, Mr. Li has had to turn away several prospective Chinese buyers over fear of how the law will impact them and him. As a result, King Realty Advisors LLC has lost business: Mr. Li is unable to broker property transactions for these Chinese individuals. In total, the company has lost over 40 prospective clients due to the impact of SB 264. This drop in clients has had other effects on Mr. Li's business, namely, the loss of two real estate agents who used to work for him. These agents had to leave Florida King Realty LLC because there was no longer sufficient work for them.

## CAUSES OF ACTION

### Count One
Violation of the Fair Housing Act
42 U.S.C. §§ 3604(a)
(By all Plaintiffs against all Defendants)

253.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 252 as though fully set forth herein.

254.    The 42 U.S.C. § 3604(a), makes it unlawful to "make unavailable or deny a dwelling to any person because of . . . national origin."

255.    SB 264 violates section 3604(a) because, as set forth in more detail above, including in Paragraphs 33-60, SB 264 institutes legal requirements that deny or otherwise make unavailable dwellings on the basis of the prospective buyer's national origin.

256.     SB 264 violates section 3604(a) because, as set forth in more detail above, including in Paragraphs 35, 39, 43-44, and 54, it creates a requirement on the basis of national origin that covered persons who own or come into ownership of real property must divest themselves of it within a specified timeframe, thereby "mak[ing] unavailable or deny[ing]" to them a dwelling.

257.     As set forth in more detail above, including in Paragraphs 33-212, SB 264 intentionally discriminates on the basis of national origin in violation of § 3604(a) because it was motivated by discriminatory intent on the basis of national origin and lacks any legitimate, non-discriminatory justification.

258.     As set forth in more detail above, including in Paragraphs 33-60, SB 264 also intentionally discriminates on the basis of national origin in violation of § 3604(a) because, on its face, it singles out individuals for less favorable treatment in housing on the basis of their national origin.

259.     As set forth in more detail above, including in Paragraphs 33-60, 72-86, and 97-212, SB 264 violates 42 U.S.C. § 3604(a) because it has an adverse disproportionate effect on people with national origins from China, Russia, Cuba, Venezuela, North Korea, Iran, and Syria and serve no legitimate, non-discriminatory purpose, and any such purpose could be served by means with a less discriminatory impact.

260.     Defendants are liable under section 3604(a) because, as set forth in more detail above, including in Paragraphs 22-24 and 33-212, Defendants' actions, by and through the implementation and enforcement of SB 264, have the purpose and effect of discriminating in the terms, conditions, or privileges of sale or rental of a dwelling because of national origin.

**Count Two**
Violation of the Fair Housing Act
42 U.S.C. §§ 3604(b)
(By all Plaintiffs against all Defendants)

261.    Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 through 252 as though fully set forth herein.

262.    The FHA, 42 U.S.C. § 3604(b), makes it unlawful to discriminate in the terms,

conditions, or privileges of sale or rental of a "dwelling" because of national origin.

263.    SB 264 violates section 3604(b) because, as set forth in more detail above,

including in Paragraphs 33-60, SB 264 institutes a legal requirement under which prospective

purchasers of dwellings are subjected to different "terms, conditions, or privileges of sale . . . of a

dwelling" because of their national origin.

264.    As set forth in more detail above, including in Paragraphs 33-212, SB 264

intentionally discriminates on the basis of national origin in violation of § 3604(b) because it was

motivated by discriminatory intent on the basis of national origin and lacks any legitimate, non-

discriminatory justification.

265.    As set forth in more detail above, including in Paragraphs 33-60, SB 264 also

intentionally discriminates on the basis of national origin in violation of § 3604(b) because, on its

face, it singles out individuals for less favorable treatment in housing on the basis of their

national origin.

266.    As set forth in more detail above, including in Paragraphs 33-60, 72-86, and 97-

212, SB 264 violates 42 U.S.C. § 3604(b) because it has an adverse disproportionate effect on

people with national origins from China, Russia, Cuba, Venezuela, North Korea, Iran, and Syria.

In particular, the prohibitions and restrictions on ownership of real property apply

disproportionately to people with national origins from these seven countries and serve no

legitimate, non-discriminatory purpose, and any such purpose could be served by means with a less discriminatory impact.

267.    Defendants are liable under section 3604(b) because, as set forth in more detail above, including in Paragraphs 22-24 and 33-212, Defendants' actions, by and through the implementation and enforcement of SB 264, have the purpose and effect of discriminating in the terms, conditions, or privileges of sale or rental of a dwelling because of national origin.

**Count Three**
Violation of the Fair Housing Act
42 U.S.C. §§ 3604(c)
(By all Plaintiffs against all Defendants)

268.    The FHA, 42 U.S.C. § 3604(c) prohibits "mak[ing], print[ing], or publish[ing], or caus[ing] to be made, printed, or published, any notice [or] statement . . . with respect to the sale of a . . . dwelling that indicates any preference, limitation, or discrimination based on . . . national origin . . . or an intention to make any such preference, limitation, or discrimination."

269.    SB 264 violates section 3604(c) because, as set forth in more detail above, including in Paragraphs 33-60, SB 264, on its face, indicates a "preference, limitation, or discrimination based on . . . national origin."

270.    In addition, as set forth in more detail above, including in Paragraphs 23 and 58, SB 264 requires buyers of real property in Florida to execute an affidavit, in a form promulgated by the FREC, stating that the buyer may legally purchase property under the terms of SB 264. In so doing, SB 264 both makes a statement indicating a preference based on national origin and requires real estate agents to make a statement indicating a preference based on national origin.

271.    Defendants are liable under section 3604(c) because, as set forth in more detail above, including in Paragraphs 22-24 and 33-60, Defendants' actions, by and through the implementation and enforcement of SB 264, including the drafting and enforcement of

implementing regulations, has the purpose and effect of making a statement that indicates a "preference, limitation, or discrimination based on . . . national origin."

### Count Four
Violation of the Fair Housing Act
42 U.S.C. § 3617
(By all Plaintiffs against all Defendants)

272.     The FHA, 42 U.S.C. § 3617, prohibits "interfere[nce] with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section..3604 [or] 3605."

273.     SB 264 violates section 3617 because, as set forth in more detail above, including in Paragraphs 33-212, SB 264 "interfere[s]" with "the exercise or enjoyment of, . . .any right granted or protected" by §§ 3604 and 3605.

274.     Defendants are liable under section 3617 because, as set forth in more detail above, including in Paragraphs 22-24 and 33-212, Defendants' actions, by and through the implementation and enforcement of SB 264, including the drafting and enforcement of implementing regulations, has the purpose and effect of "interfering" with "the exercise or enjoyment of, . . .any right granted or protected" by Section 804.

### Count Five
Violation of Equality of Rights
Article I, Section 2 of the Florida Constitution
(By King Realty LLC against all Defendants)

275.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 212 and 249-52 as though fully set forth herein.

276.     Article I, Section 2 of the Florida Constitution establishes that "[a]ll natural persons . . . are equal before the law" and guarantees that "[n]o person shall be deprived of any

right because of . . . national origin[.]" Fla. Const. Art. I § 2. Among those rights is the right to

acquire, possess, and protect property.

277.    SB 264 violates the Article I, Section 2's anti-discrimination guarantee by, on its

face, discriminating in "the ownership, inheritance, disposition, and possession of real property"

on the basis of national origin.

278.    As set forth in more detail above, including in Paragraphs 33-212, Defendants, by

and through the implementation and enforcement of SB 264, have engaged in discrimination

based on national origin.

**Count Six**
Violation of Right to Property
Article I, Section 2 of the Florida Constitution
(By King Realty LLC against all Defendants)

279.    Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 through 212 and 249-52 as though fully set forth herein.

280.    Article I, Section 2 of the Florida Constitution guarantees to all natural persons

the right to "acquire, possess and protect property." Fla. Const., Art. I § 2.

281.    SB 264 violates Article I, Section 2's guarantee of the right to property by

significantly restricting the right of covered individuals to purchase and own real property in the

state of Florida and by imposing an obligation upon covered individuals to divest themselves of

real property within a specified timeframe.

282.    As set forth in more detail above, including in Paragraphs 33-60 and 72-86, SB

264's restrictions on the right to property are not reasonably necessary to achieving a legitimate

government objective.

283.    As set forth in more detail above, including in Paragraphs 22-24, 33-60, and 72-

86, Defendants, by and through the implementation and enforcement of SB 264, have violated

the right to acquire, possess, and protect property violation of Article I, section 2 of the Florida Constitution.

## PRAYER FOR RELIEF

284.    WHEREFORE, Plaintiffs request that this Court grant the following relief:

(a)  Enter a declaratory judgment finding that the conduct set forth in the foregoing causes of action violates the Fair Housing Act and Article 1, section 2 of the Florida Constitution;

(b)  Enter a permanent injunction prohibiting Defendants from engaging in the unlawful conduct described herein and requiring all Defendants to take all steps necessary to remedy the effects of such conduct;

(c)  Award Plaintiffs their reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613; and

(d)  Award any such other relief as the Court deems fair and equitable.

Dated: May 6, 2024                         Respectfully submitted,

/s/ *J. Courtney Cunningham*
J. Courtney Cunningham
J. Courtney Cunningham, PLLC
Florida Bar No. 628166
8950 SW 74th Ct, Suite 2201
Miami, FL, 33156
Tel: (305) 351-2014
Email: cc@cunninghampllc.com

Reed Colfax*
Yiyang Wu*
Zoila Hinson*
Relman Colfax, PLLC
1225 19th St., N.W., Suite 600
Washington, D.C. 20036
Tel: 202-728-1888

Fax: 202-728-0848
Email: rcolfax@relmanlaw.com
ywu@relmanlaw.com
zhinson@relmanlaw.com

Noah Baron*
Shalaka Phadnis*
Niyati Shah*
Asian Americans Advancing Justice
1620 L St NW Ste 1050,
Washington, DC, 20036
Tel: (202) 296-2300
Email: nbaron@advancingjustice-aajc.org
sphadnis@advancingjustice-aajc.org
nshah@advancingjustice-aajc.org

Scott Chang*
National Fair Housing Alliance
1331 Pennsylvania Ave., N.W., #650
Washington, DC 20004
Tel: 202-898-1661
Email: schang@nationalfairhousing.org

*Attorneys for Plaintiffs*

\* *Pro hac vice* applications to be files

65